UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

---

| | |
|---|---|
| YAZDIAN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | No. 1:06cv316 |
| LUFTHANSA GERMAN AIRLINES, ) | Judge Susan J. Dlott |
| ) | |
| Defendant. ) | |
| ) | |

## MOTION FOR SUMMARY JUDGMENT

Defendant, LUFTHANSA GERMAN AIRLINES ("LUFTHANSA"), pursuant to Federal Rule of Civil Procedure 56, moves for summary judgment in its favor and against Plaintiffs, Robabe Yazdian and Robabe Yazdian, on all of their claims, as set forth in the Memorandum herein.

LUFTHANSA GERMAN AIRLINES,


By: ____s/Brandt R. Madsen_____
     One of its Attorneys


BRANDT R. MADSEN
ANNA M. PANCHENKO
MADSEN, FARKAS & POWEN, LLC
20 South Clark Street
Suite 1050
Chicago, Illinois  60603
(312) 379-3444, telephone
(312) 379-3443, facsimile
Attorney No.:  37934

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| YAZDIAN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | No. 1:06cv316 |
| LUFTHANSA GERMAN AIRLINES, ) | Judge Susan J. Dlott |
| ) | |
| Defendant. ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant, LUFTHANSA GERMAN AIRLINES ("Lufthansa"), in support of its motion for summary judgment, states as follows:

**I.  INTRODUCTION**

This matter arises out of the April 29, 2004 incident at O'Hare International Airport ("O'Hare") when Robabe Yazdian ("Mrs. Yazdian"), fell while attempting to sit in a wheelchair after arriving at O'Hare from Teheran, Iran with her husband, Ali Yazdian ("Mr. Yazdian"). Non-party, Prospect Airport Services, Inc. ("Prospect",) provided wheelchair services. Fact discovery is complete and neither Mrs. Yazdian nor Mr. Yazdian has any explanation as to how the incident occurred. Mr. Yazdian did not witness the actual fall, and Mrs. Yazdian was not facing the wheelchair before her fall, and does not know what occurred. Conversely, Prospect's manager, Vladimir Raikov ("Mr. Raikov"), and wheelchair pusher, Bozhidara Svirkova ("Ms. Svirkova"), affirmatively testified the wheelchair breaks were engaged, Ms. Svirkova had her hands on the wheel chair, and the wheelchair did not move prior to the fall.

Simply put, the Yazdians cannot establish breach of duty or causation, and summary judgment is appropriate in favor of Lufthansa to dismiss this re-filed complaint.

2

## II.   STATEMENT OF UNCONTESTED FACTS

The Yazdians' First Amended Complaint reads in pertinent part:

> Mrs. Yazdian stepped from the Lufthansa aircraft through the exit door onto the debarking platform where she took a few steps to the wheelchair which had been provided by Lufthansa. *She turned around and proceeded to sit in the wheelchair* when it unexpectedly and suddenly moved backwards causing her to lose her balance and in an attempt to regain equilibrium she thrust forward, forcefully hitting her head and body against the wall of the platform.

(First Am. Compl. § 11, at 3, Ex. A)(emphasis added.) Plaintiffs further allege that Lufthansa, directly or through Prospect, was negligent in failing to provide sufficient assistance, personnel, and/or equipment to assure that Mrs. Yazdian would be safely seated in the wheelchair. (First Am. Compl., § 13, Ex. A.)

Written discovery has been exchanged, and four depositions have been taken: 1) Mrs. Yazdian; 2) Mr. Yazdian; 3) Mr. Raikov); and 4) Ms. Svirkova. At Mr. Raikov's deposition, several Prospect incident reports and the witnesses' statements pertaining to the subject incident were admitted without objection into evidence. (Mr. Raikov's Dep., at 27:18-20, 31:1-3, Ex. B.) Among these reports and statements are: 1) Mr. Raikov's typed statement made on the day of the incident, (Mr. Raikov's statement, Ex. C), 2) Prospect's incident report prepared on the day of the incident, (Prospect's report, Ex. D), and 3) Ms. Svirkova's typed statement made on the day of the incident, (Ms. Svirkova's statement, Ex. E).

All fact discovery is now closed in this matter[1]. (Court order of July 16, 2008, Ex. F.)

### ***Before the fall***

Prior to her departure from Tehran, Iran, Mrs. Yazdian was suffering from a urinary tract infection. (Mrs. Yazdian's Dep., at 116:10-15, Ex. G.) Further, during her trip to Iran, Mrs.

---

[1] At the parties request, the Court agreed to stay medical/damage related discovery until after ruling on the dispositive motions.

3

Yazdian was taking five different types of medication: lanoxin, lasix, coumadin, quinidine, and propranolol. (Mrs. Yazdian's Dep., at 123:7-21, Ex. G.) Also, the night prior to her departure from Iran, Mrs. Yazdian did not sleep as she and Mr. Yazdian were hosting a lot of guests. (Mrs. Yazdian's Dep., at 84:24-85:3, Ex. G.) The aircraft then departed at 2:00 a.m., local time, and Mrs. Yazdian did not sleep on the flight to Frankfurt. (Mrs. Yazdian's Dep., at 84:13-21, 85:19-21.) Nor did she sleep during the 8-10 hour layover in Frankfurt. (Mrs. Yazdian's Dep., at 88:6-9.) Mrs. Yazdian did get only a few hours sleep on the 9 hour flight to Chicago. (Mrs. Yazdian's Dep., at 92:16-19.)

### *The wheelchair brakes were engaged*

The Yazdians admitted that prior to Mrs. Yazdian's fall, they did not witness the position of the parking brakes on the wheelchair Mrs. Yazdian was approaching. (Mrs. Yazdian's response to Req. to Admit, § 10, Ex. H; Mr. Yazdian's response to Req. to Admit, § 10, Ex. I.) Nor did the Yazdians witness the position of the parking brakes after Mrs. Yazdian's fall. (Mrs. Yazdian's response to Req. to Admit, § 12, Ex. H; Mr. Yazdian's response to Req. to Admit, § 12, Ex. I.) Moreover, Mr. Yazdian admitted that he was unable to see whether the wheelchair moved prior to his wife's fall. (Mr. Yazdian's Dep., at 103:18-24, Ex. J.) Mr. Yazdian stated at his deposition:

> Q: . . . Did you see the chair move or did you not see the chair move?
> A: I didn't see the chair move, but I saw when she was – before she sit down she was close to here (indicating). Then I saw the chair moved back and then I heard that noise. But I didn't see physically – I be honest with you – if the chair moved. (Mr. Yazdian's Dep., at 103:18-24, Ex. J.)

At her deposition, Ms. Svirkova stated that while waiting for Mrs. Yazdian, she activated both brakes on the wheelchair. (Ms. Svirkova's Dep. at 18-19, Ex. K.) Also, both of her arms remained on the wheelchair throughout the incident. *Id.* at 19:19-21. At no point in time did the

4

subject wheelchair move. *Id.* at 19:22-20:2, 23:16-19. Further, immediately before, and at the time of the fall, Mr. Raikov was directly behind Ms. Svirkova. (Mr. Raikov's Dep., at 22:8-10, Ex. B.) According to Mr. Raikov, Ms. Svirkova was holding the wheelchair with both hands at all times throughout the incident. (Mr. Raikov's Dep., at 35:17-22, Ex. B.) Also, Mr. Raikov observed that the wheelchair brakes were on at the time of Mrs. Yazdian's fall. (Mr. Raikov's Dep., at 35:23-36:3, Ex. B.)

The wheelchair in question cannot move when the brakes are engaged. (Ms. Svirkova's Dep., at 19:22-20:2, Ex. K.)

### *Mrs. Yazdian does not know what caused her fall*

Mrs. Yazdian admitted that she did not see whether the subject wheelchair moved from underneath her. (Mrs. Yazdian's Dep., at 107:3-10, 110:6-12, Ex. G.) As a matter of fact, Mrs. Yazdian was not looking at the wheelchair prior to her fall. (Mrs. Yazdian's Dep., at 110:6-12, Ex. G.) Mrs. Yazdian testified that she could not turn her head to look whether the chair was moving. *Id.* Mrs. Yazdian repeatedly stated she could not relate what transpired, and that we better ask Mr. Yazdian. (Mrs. Yazdian's Dep., at 108:18-19, 111:13, 112:21.) Mrs. Yazdian indicated that as she attempted to sit in the wheelchair she fell forward, landing about fifteen feet away from the wheelchair and hitting her head against the wall of the jet bridge. (Mrs. Yazdian's Dep., at 110:13-24, 111:9-10, Ex. G.) Mrs. Yazdian claims to have lost consciousness. (Mrs. Yazdian's Dep., at 111:11-21, Ex. G.) Specifically, at her deposition, Mrs. Yazdian provided the following testimony:

> A: I couldn't turn this way to see if she had a hold of this or no.
> Q: So you just don't know one way or the whether she was holding it?
> A: Yeah. (Mrs. Yazdian's Dep., at 110:6-12, Ex. G.)

5

Q: Okay. That's helpful. We'll move on then. As you were sitting down, did you move your head at all? As you go from a standing position to begin to sit, did you move you move your head?
A: I don't remember.
Q: Okay. But at some point you fell forward; is that correct?
A: Yeah.
Q: How far was it from the wheelchair to where your head hit –
A: I said from here to over there (indicating). (Mrs. Yazdian's Dep., at 110:13-24, Ex. G.)

. . .

Q: That's about 15 feet away?
A: I believe it was. (Mrs. Yazdian's Dep., at 111:9-10, Ex. G.)

Q: Okay. And you somehow hit your head 15 feet away from where you were trying to sit down?
A: You should ask my husband –
Q: Okay.
A: Because I was gone.
Q: What do you mean you were gone?
A: When I get – hit my head then after that I can't –
Q: Did you become unconscious?
A: Yeah. Yes, unconscious. Until nighttime I remember what is going on. (Mrs. Yazdian's Dep., at 111:11-21, Ex. G.)

### *Mr. Yazdian did not see how Mrs. Yazdian fell*

Similarly, Mr. Yazdian did not see Mrs. Yazdian until *after* she fell and was already on the floor. (Mr. Yazdian's Dep., at 82:19-24, 83:1-8, 83:24-84:16, Ex. J.) Mr. Yazdian just heard a sound, and saw her on the ground *after* she already fell. *Id.* Mr. Yazdian testified that:

Q: Okay. But you just did not happen to be looking at the wheelchair at the time your wife was trying to sit down?
A: No. Because I knew she's in good hands. I trust these people. But when I heard the noise I saw she's on the floor, I just. . . . (Mr. Yazdian's Dep., at 82:19-24, Ex. J.)

Q: Okay. So – so you can't testify one way or the other whether she was trying to grab the armrest is that a fair statement, because you did not see it?
A: I didn't – I just heard the noise, she is on the floor. (Mr. Yazdian's Dep., at 83:1-8, Ex. J.)

6

Q: Okay. And this says, "she suddenly fell." You know she fell but you don't know why, correct?
A: At that time I did not know why she fall. (Mr. Yazdian's Dep., at 83:6-8, Ex. J.)

…

Q: Okay. So – did you see her head hit the wall?
A: No.
Q: Your – your attention wasn't drawn to that spot –
A: No.
Q: -- until the sound?
A: Right.
Q: And by that time her head already hit?
A: She was already on the floor?
Q: She was already on the floor.
A: Yes.   (Mr. Yazdian's Dep., at 83:24-84:16, Ex. J.)

### *Witnesses who observed the fall*

Mr. Raikov saw the Yazdians exit the aircraft and walk towards the wheelchair. (Mr. Raikov's Dep., at 37:13-17, Ex. B.) Mr. Yazdian was holding Mrs. Yazdian's arm. *Id.* As they were approaching the wheelchair, Mr. Yazdian released Mrs. Yazdian's arm, and Mrs. Yazdian proceeded to the wheelchair on her own. (Mr. Raikov's Dep., at 39:15-17, Ex. B.) As Mrs. Yazdian was walking towards the chair, she tried to reach the armrest of the wheelchair, lost her balance, fell down, and hit the wall of the jetbridge with the back of her head. (Mr. Raikov's Dep., at 39:20-24, Ex. B.)

Likewise, Ms. Svirkova observed how the Yazdians existed the airplane and were walking towards the wheelchair. (Ms. Svirkova's Dep. at 21:9-17, Ex. K.)  According to Ms. Svirkova, Mr. Yazdian was holding Mrs. Yazdian's arm. *Id.* at 21:18-20. As the Yazdians were approaching the wheelchair, Mr. Yazdian released Mrs. Yazdian's arm. *Id.* at 22:22-23:1. After

Mr. Yazdian let go of Mrs. Yazdian's arm, she lost her balance and fell on the floor. *Id.* at 22: 18-21.

Mr. Raikov's and Ms. Svirkova's testimony are consistent with the statements contained in Prospect's incident reports and the witnesses' statements that were admitted into evidence during Mr. Raikov's deposition. (Mr. Raikov's Dep., at 27:18-20, 31:1-3, Ex. B; Mr. Raikov's statement, Ex. C; Ms. Svirkova's statement, Ex. E; Prospect's incident report, Ex. D.)

The report and statements were made immediately after the incident by Mr. Raikov in accordance with Prospect's regular practice and procedures. (Mr. Raikov's Dep., at 25-27, Ex. B.) The April 29, 2004 typed statement signed by Mr. Raikov reads in relevant part:

> [h]er husband was assisting her by holding her arm, as they approached the whellchair her husband let go of her arm and she fell backwards and hit her head on the jet bridge wall. Ms. Svirkova B. was the wheelchair assistant and she was holding the wheelchair from behind with the brakes on. It looks like [Mrs. Yazdian] lost her balance when her husband let go of her.

(Mr. Raikov's statement, Ex. C.)

Similarly, Prospect's incident report filled in by Mr. Raikov states that "[t]he lady was walking off the aircraft and while approaching the WC [wheel chair], she tried by [sic] grab the armrest of the WC [wheel chair], she lost balance and fell on the floor and hit her back head in [sic] the wall of the jet-bridge." (Prospect's incident report, Ex. D.)

Further, on April 29, 2004, in accordance with Prospect's regular practice and policies, Ms. Svirkova recorded her observations pertaining to Mrs. Yazdian's fall. Mr. Raikov typed Ms. Svirkova's statement, based upon information provided by Ms. Svirkova. (Mr. Raikov's Dep. at 28-29.) However, Ms. Svirkova read and signed the statement. (Mr. Raikov's Dep. at 29.) The statement reads that:

> [a] lady walked off the airplane with her husband helping her to the wheelchair by holding her arm. When they approached the wheelchair, her

8

husband let go of her arm and as she reached for the arm rest she lost her balance and fell. I was standing behind holding the wheelchair with the brakes on at this time.

(Ms. Svirkova's statement, Ex. E)

### *Mrs. Yazdian's alleged injuries/ Medical records*

The parties stipulated to admitting Mrs. Yazdian's medical records from Resurrection Medical Center Hospital ("Resurrection") into evidence. (Mrs. Yazdian's Dep, at 69:18-70:1, Ex. G.) On April 30, 2004, just one day *after* the fall, Mrs. Yazdian had an infectious disease evaluation at Resurrection. (Mrs. Yazdian's medical records from Resurrection, Ex. L.) The report of the evaluation states in relevant part:

> [t]he patient states that prior to leaving Iran she developed fevers for 3-4 days before she flew. She was also feeling very weak. She was complaining of diarrhea at the time. . . . She states that she did have nausea and vomiting, had some diarrhea, but currently that has improved.

(Mrs. Yazdian's medical records from Resurrection, Ex. L.) Further, on May 2, 2004, Mrs. Yazdian was evaluated in connection to a diagnosis of anemia. The report of evaluation states:

> [w]hile making connections at O'Hare Airport, [Mrs. Yazdian] became weak, dizzy, and slipped out of her wheelchair. She was brought to the emergency at Resurrection Medical Center where she was noted to be anemic, febrile with diarrhea and in modest renal failure.

(Mrs. Yazdian's medical records from Resurrection, Ex. L.)

### *Mr. Yazdian's loss of consortium claim*

Mrs. Yazdian admitted that since the subject incident, her ability to have a sexual relationship with Mr. Yazdian had *not* changed. (Mrs. Yazdian's Dep., at 163:11-15, Ex. G.)

9

### III. ARGUMENT

Summary judgment is proper if the evidence submitted shows that there is no genuine issue of material fact, and that a moving party is entitled to judgment as a matter of law. *Nix v. O'Malley*, 160 F.3d 343, 347 (6th Cir. 1998). Once a moving party meets this initial burden, it becomes the burden of a non-moving party to come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find a genuine fact issue for trial. *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995). Although the court considers all facts and inferences drawn therefrom in the light most favorable to a non-moving party, a non-moving party cannot rely on conclusory allegations to counter a motion for summary judgment. *Nix*, 160 F.3d at 347.

> **A.  This Court should enter judgment against the Yazdians, as they failed to present any evidence demonstrating that Lufthansa's acts and/or omissions caused Mrs. Yazdian's fall.**

In a negligence action, a plaintiff must demonstrate that: 1) a defendant owed him/her a duty; 2) a defendant breached its duty; 3) the breach of duty was the proximate cause of his/her injury; and 4) her injury resulted in damages. *Tackett v. Wal-Mart Stores East, Inc.*, 2007 WL 2668133, at *2 (S.D. Ohio 2007). The burden of proving negligence and proximate cause is upon a plaintiff. *Stehn v. Bernarr MacFadden Foundations, Inc.*, 434 F.2d 811, 813 (6th Cir. 1970). Under Ohio law, the mere occurrence of an accident does not give rise to presumption of negligence, and where one is accidentally injured, the burden is upon the person injured to show negligence upon the part of another. *Tackett*, 2007 WL 2668133, at *2; *see also Leahy v. Detroit, M. & T. Short Line RY*, 240 F. 82, 83 (6th Cir. 1917). To establish negligence, it is incumbent upon a plaintiff to identify or explain the reason for the fall. *Stamper v. Middletown Hospital Ass'n*, 65 Ohio App. 3d 65, 67-68, 582 N.E.2d 1040, 1042 (12th Dist. 1989). Where a

10

plaintiff, either personally or by outside witnesses, cannot identify what caused the fall, a finding of negligence is precluded. *Id.* The following Ohio case law demonstrates the application of the above stated principles to cases similar to the present case.

In *Stamper*, a hospital's employee, after falling down a stairway, sued an architectural firm, an installation firm, and manufacture of the stairway (collectively "Defendants"). *Stamper*, 65 Ohio App. 3d at 67, 582 N.E.2d at 1042. The defendants moved for summary judgment, arguing that the employee failed to demonstrate that the defendants' acts and/or omissions proximately caused her injuries. *Id.* At her deposition, the employee provided the following testimony regarding the cause of her fall:

> Q: Do you know what caused you to fall that day?
>
> A: No, I just fell. I don't remember. I just remember failing and being scared. . . .
>
> Q: Now, on the day of the accident, were the stairs slippery? Was the slippery-surface slippery on the day of the accident?
>
> A: To tell you the truth, I don't remember just remember a fall. I just fell. I don't know.

The Court found that the employee's testimony was devoid of any explanation as to the cause of her fall. *Id.* at 68, 582 N.E.2d at 1042. Based on this finding the Court granted the defendants' motion for summary judgment, stating that no negligent act or omission on the part of the defendants proximately caused the employee's fall. *Id.*

In *Bozsik v. Aldi, Inc.*, 2006 WL 3208544 (Ohio App. 9th Dist. 2006), a customer sued a grocery store for injuries she sustained after she had fallen in the store. *Bozsik v. Aldi, Inc.*, 2006 WL 3208544, at *1 (Ohio App. 9th Dist. 2006). The grocery store moved for summary judgment, arguing that the customer failed to present evidence of what caused her fall. *Id.* at *2. During her deposition, the customer testified that her foot had to come into contact with the

11

pallet causing her to fall and that she tripped over "something" and did not slip. *Id.* However, the customer was only presuming that the pallet was something that caused her to fall. *Id.* Further, to oppose the motion for summary judgment, the customer submitted the affidavit of an occurrence witness, stating that although the witness did not see the customer's trip, he saw her falling and then looked down and saw the pallet. *Id.* In his affidavit, the witness indicated that he "thinks" that the customer tripped over the pallet. *Id.* The Appellate Court affirmed the trial court's grant of the grocery store's motion for summary judgment, finding that the customer's deposition testimony and the witness's affidavit were not more than conjecture about what caused the customer's fall and were insufficient to support her negligence claim. *Id.* The Court reasoned that 1) the witness only had personal knowledge of seeing the customer's fall and what happened afterwards, and 2) the customer testified about what she was doing before the fall and that something had to cause her to fall. *Id.* There was no testimony about the cause or reason for the fall. *Id.* Accordingly, in the Court's opinion, reasonable minds can reach no other conclusion than there was no negligent act or omission on the part of the grocery store. *Id.*

In *Mahmoud v. Dennis*, 2005 WL 1661966 (Ohio App. 6th Dist. 2005), a tenant's mother sued a landlord for injuries she sustained after she had fallen at the bottom of the basement stairs. *Mahmoud v. Dennis*, 2005 WL 1661966, at *1 (Ohio App. 6th Dist. 2005). During her deposition, the tenant's mother described her fall through an interpreter as follows: "[i]t was daytime and she had her regular flat shoes on. She was going down the basement steps to retrieve something from the freezer. She got off the last step and proceeded to step in water [accumulated in the basement]. This caused her to turn around. In attempting to turn around after stepping in water, she fell on the floor. She had no present memory of what happened after she fell." *Id.* at *4. The landlord moved for, *inter alia*, summary judgment, arguing that the

12

tenant's mother failed to establish that the landlord's negligence caused her injuries. *Id.* at *3. The Court granted the landlord's motion for summary judgment, finding that the tenant's mother was unable to establish that any breach of duty on the landlord's part proximately caused her injuries. *Id.* at *4. The Court concluded that if the plaintiff's evidence relating to proximate cause was so meager and inconclusive as to amount to speculation and conjecture, the defendant is entitled to summary judgment as a mater of law. *Id.*

In the present case, just like in *Stamper*, *Bozsik* and *Mahmoud*, this court should grant Lufthansa's motion for summary judgment as the Yazdians failed to present any evidence demonstrating that any Lufthansa's acts and/or omissions caused Mrs. Yazdian's fall. The evidence in the present case clearly demonstrates that the Yazdians' allegations that Mrs. Yazdian fell because the wheelchair moved are not more than conjecture and/or speculation. Indeed, as in *Bozsik*, Mrs. Yazdian herself does not have personal knowledge of what caused her fall – she was looking the other way. Nor does she have any personal knowledge of what happened after the fall, as according to Mrs. Yazdian, she lost her consciousness as a result of the fall. (Mrs. Yazdian's Dep. at 107:3-10; 11:9-10, Ex. G.) Mrs. Yazdian admitted that immediately prior to her fall, she was unable to see the wheelchair and/or the wheelchair pusher. (Mrs. Yazdian's Dep. at 110:6-12, Ex. G.) Thus, Mrs. Yazdian has no way of knowing whether the wheelchair pusher was holding the wheelchair and whether the wheelchair moved. *Id.* Also, Mrs. Yazdian admitted that neither before nor after her fall, she was able to observe the position of the wheelchair parking brakes. (Mrs. Yazdian's response to Req. to Admit, §§ 10, 12, Ex. H.) Mrs. Yazdian's allegations about the cause of her fall come from her husband, Mr. Yazdian. (Mrs. Yazdian's Dep., at 108:18-19, 111:13, 112:21.)

Yet, Mr. Yazdian himself did not witness his wife's actual fall.  (Mr. Yazdian's Dep. at 43:20-24; 44:8-13; 82:19-24, Ex. J.)  Further, Mr. Yazdian admitted that he did not see whether the chair moved at the time of Mrs. Yazdian's fall.  (Mr. Yazdian's Dep. at 103:18-24, Ex. J.)  He also admitted that he did not observe the position of the wheelchair parking brakes either before or after his wife's fall.  (Mr. Yazdian's response to Req. to Admit, §§ 10, 12, Ex. I.)  According to Mr. Yazdian, he just heard the sound and then he saw his wife already on the floor.  (Mr. Yazdian's Dep. at 83:1-8, Ex. J.)   Indeed, here, the testimony of Mr. Yazdian is akin to the testimony of the occurrence witness in *Bozsik*.  As the occurrence witness in *Bozsik*, Mr. Yazdian just assumes and/or thinks that his wife fell because the wheelchair moved and/or because the wheelchair pusher was not holding the wheelchair.  However, Mr. Yazdian does not possess any evidence to support his assumption.

On the other hand, both Mr. Raikov and Ms. Svirkova had ample opportunity to observe Mrs. Yazdian's fall.  They provided clear testimony as to how the fall occurred.  Both Mr. Raikov and Ms. Svirkova testified that the wheelchair brakes were activated at the time and prior to Mrs. Yazdian's fall.  (Mr. Raikov's Dep. at 35:23-36:3, Ex. B; Ms. Svirkova's Dep. at 18-19, Ex. K.)  Further, Mr. Raikov and Ms. Svirkova confirmed that Ms. Svirkova had both of her hands on the wheelchair throughout the incident.  (Mr. Raikov's Dep. at 35:23-36:3, Ex. B; Ms. Svirkova's Dep. at 19:19:21, Ex. K.)  Mr. Raikov and Ms. Svirkova both indicated that Mrs. Yazdian lost her balance and fell after Mr. Yazdian released her arm before reaching the wheelchair.  (Mr. Raikov's Dep., at 39:15-17, Ex. B; Ms. Svirkova's Dep. at 22:18-23:1, Ex. K.)  Mr. Raikov's and Ms. Svirkova's recount of the incident is supported by the admitted-into-evidence Prospect's incident reports and the witnesses' statements.  (Mr. Raikov's statement, Ex. C; Ms. Svirkova's statement, Ex. E; Prospect's incident report, Ex. D.)

The statements contained in Mrs. Yazdian's medical records from Resurrection further support the fact that Mrs. Yazdian's fall had nothing to do with Lufthansa's acts and/or omissions. The parties stipulated to admitting these records into evidence. (Mrs. Yazdian's Dep. at 69:18-70:1, Ex. G.) Furthermore, Mrs. Yazdian's statements contained in Resurrection's records fall within an exception to the hearsay rule providing that "statements made for medical diagnosis or treatment and describing medical history, or past or present symptoms . . . insofar as reasonably pertinent to diagnosis or treatment" are not excluded by the hearsay rule. FED. R. EVID. 803(4) (West 2008). Here, on April 30, 2004, the next day after the accident, Mrs. Yazdian made a statement to her treating physician at Resurrection that "prior to leaving Iran she developed fevers for 3-4 days before she flew. She was also feeling very weak. She was complaining of dysuria [sic] at the time. . . . She states that she did have nausea and vomiting, had some diarrhea, but currently that has improved." (Mrs. Yazdian's medical records from Resurrection, Ex. L.) Further, the May 2, 2004, report of evaluation states that "[w]hile making connections at O'Hare Airport, [Mrs. Yazdian] became weak, dizzy, and slipped out of her wheelchair. She was brought to the emergency room at Resurrection Medical Center where she was noted to be anemic, febrile with diarrhea and in modest renal failure." *Id.* Without any doubt, Mrs. Yazdian made the above-cited statements, describing her past and present symptoms for medical diagnosis or treatment. Clearly, the above-cited statements provide better explanation for the cause of Mrs. Yazdian's fall and are consistent with the testimony of Mr. Raikov and Ms. Svirkova. The statements suggest that on the day of her fall, Mrs. Yazdian was experiencing health problems, and was feeling weak and dizzy. Furthermore, Mrs. Yazdian herself admitted that the night prior to her flight from Iran began she did not sleep. (Mrs. Yazdian's Dep., at 116:10-15, Ex. G.) Also, during her trip to Iran, Mrs. Yazdian was suffering

15

from a urinary tract infection.  (Mrs. Yazdian's Dep., at 116:10-15, Ex. G.)  Additionally, at the time of her fall, Mrs. Yazdian was taking at least five different types of medication—lanoxin, lasix, Coumadin, quinidine, and propranolol—all of which could cause side effects, such as dizziness and weakness.  (*See* Mrs. Yazdian's Dep., at 123:7-21, Ex. G; Affidavit of Dr. Kevin Favro, Exhibit M.)   In such a condition, one can easily lose balance and fall.  Therefore, in the instant case, no genuine issue of material fact exists that no acts or omissions on Lufthansa's behalf proximately caused Mrs. Yazdian's fall.  Therefore, Lufthansa is entitled to judgment in its favor as a matter of law.

> **B. This court should enter judgment against Mr. Yazdian as the evidence presented in this case clearly demonstrates that he did not suffer a loss of consortium.**

To maintain a spousal consortium claim, a plaintiff must prove three elements: 1) that the defendant negligently or intentionally caused the injuries of the plaintiff's spouse; 2) that a plaintiff has suffered a loss of consortium; and 3) the injuries of the plaintiff's spouse have caused the loss of consortium.  *Brockmeyer v. Mansfield General Hospital*, 1987 WL 7154, at *3 (Ohio App. 5th Dist. 1987).  In Ohio, the law is clear that a wife owes a duty to her husband of consortium which, in general means conjugal society and assistance.  *Williams v. Ward*, 18 Ohio App. 2d 37, 246 N.E.2d 780, 783 (6th Dist. 1969).  The common law also recognizes the right of a husband to maintain an action against anyone who tortiously impairs the ability of the wife to perform her duty and deprives the husband of his right to such conjugal society and assistance.  *Id.*  At common law, the term consortium includes three elements: service, society, and *sexual intercourse*.  *Id.* (emphasis added).  Consortium is the name of the sexual and other services (apart from financial support) that spouses render to each other.  *Love v. Lerch*, 1993 WL 8200, at *5 (N.D. Ill. 1993).

Here, Mrs. Yazdian failed to present sufficient evidence that he suffered a loss of consortium.  At her deposition, Mrs. Yazdian clearly admitted that the subject incident did not affect her sexual relationship with Mr. Yazdian.  (Mrs. Yazdian's Dep., at 163:11-15, Ex. G.)  Therefore, this court should enter judgment against Mr. Yazdian on his loss-of-consortium claim.

WHEREFORE, Defendant, Lufthansa German Airlines requests that this Court enter judgment in its favor and against Plaintiffs, Robabe and Ali Yazdian, for such further relief as this Court deems just.

LUFTHANSA GERMAN AIRLINES,


By: ____s/Brandt R. Madsen_____
    One of its Attorneys

BRANDT R. MADSEN
ANNA M. PANCHENKO
MADSEN, FARKAS & POWEN, LLC
20 South Clark Street
Suite 1050
Chicago, Illinois  60603
(312) 379-3444, telephone
(312) 379-3443, facsimile

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 14, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Douglas Shaw Weigle
Justin W. Bartlett
Bartlett and Weigle Co., LPA
432 Walnut Street, Suite 1100
Cincinnati, OH  45202
Phone: 513-241-3992
Fax: 513-241-1816

Justin W. Bartlett
Bartlett and Weigle Co., LPA
432 Walnut Street, Suite 1100
Cincinnati, OH  45202
Phone: 513-241-3992
Fax: 513-241-1816

Harry J. Finke, Esq.
Graydon  Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202
hfinke@graydon.com
513-629-2731
513-651-3836 fax

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  none.

      s/Brandt R. Madsen
      Brandt R. Madsen
      Attorney for Defendant
      MADSEN, FARKAS & POWEN, LLC
      20 South Clark Street
      Suite 1050
      Chicago, Illinois  60603
      (312) 379-3444, telephone
      (312) 379-3443, facsimile